

**Opinions:**

Mr. Raynor reported that prior to his injury he was prescribed ibuprofen for pain which was beneficial and was also taking Gabapentin for seizures. He reports not taking those medications currently or since his injury, only Tylenol. I suspect that his treating physician discontinued NSAID's due to Mr. Raynor's reported complaints of bloody emesis. Mr. Raynor did have evaluation with gastroenterology which I believe did not demonstrate active GI bleed therefore, NSAID's may be a viable treatment option going forward. He was also taking Gabapentin previously for what he reports is a seizure disorder. Gabapentin is commonly used to treat neuropathic pain from either diabetic peripheral neuropathy or post-herpetic neuralgia. He may have been obtaining benefit from Gabapentin in his neurologic symptoms related to his lumbar spine prior to his injury. Gabapentin was discontinued at some point, although the reason is not entirely clear from the records. In the records, there is reference to a referral to a neurologist because of seizures. It appears from the record that after that evaluation, Mr. Raynor was diagnosed with pseudoseizures and was not felt that he had true epilepsy which may be the reason for discontinuation of this medication. Gabapentin may also be a viable treatment option to improve his symptoms going forward.

(( It is my opinion to within a reasonable degree of medical probability that Mr. Raynor did suffer an injury on January 10, 2013 as a result of the altercation. It is my opinion that his fall, after being struck, aggravated the pre-existing spondylolisthesis at L4-L5 and lumbar stenosis. Falling backwards onto his buttocks produces both an axial load to the spine column and flexion force as well. The MRI of his lumbar spine does not demonstrate new or previous fracture or ligamentous disruption. The MRI does confirm, however, that the spondylolisthesis at L4-L5 is mobile. Weight-bearing plain x-rays demonstrated a spondylolisthesis over 10 mm which is diagnostic of radiographic instability. On the non-weight-bearing supine position MRI, the spondylolisthesis is significantly reduced. The spondylolisthesis (vertebral shift) increases with weight-bearing activities increasing neurologic compression within the spinal canal at L4-L5 leading to neurologic symptoms into the lower extremities. Once the weight bearing activity is lessened (sitting, lying down), the spondylolisthesis reduces (seen on MRI) and decreases neurologic impingement and reduces neurologic symptoms. Obesity has been associated with radiographic progression of spondylolisthesis (increased subluxation over time). It is unclear as to the extent of the L4-5 spondylolisthesis prior to the injury. Prior radiographs document disk degeneration in the lumbar spine and spondylolisthesis, however, standing flexion and extension radiographs had not been performed. ))

**WEST END OFFICE** 7858 SHRADER ROAD, RICHMOND, VA 23294
SOUTHSIDE OFFICES 13801 ST. FRANCIS BOULEVARD, SUITE 200, MIDLOTHIAN, VA 23114

PH (804) 270-1305 / FX (804) 273-9294 / WWW.ADVANCEDORTHO.ME

7 | Page

 

It is my opinion to within a reasonable degree of medical probability that Mr. Raynor's injury has exacerbated his pre-existing lumbar stenosis and spondylolisthesis. The spondylolisthesis and spinal stenosis cause weakness and numbness in the lower extremities through the mechanism described previously. Patients with symptomatic spondylolisthesis and spinal stenosis often wax and wane in the extent of their symptoms. It is generally accepted that localized inflammation at sites of neurologic compression lead to symptoms of radiculitis (nerve root pain). The extent of localized inflammation can be variable whereas the neurologic compression is relatively constant. Common causes of increased inflammation are falls, trauma, and over-exertion. The physical altercation and fall that Mr. Raynor had on January 10, 2013 are consistent with a mechanism that would increase inflammation.

It is my opinion to within a reasonable degree of medical probability that additional treatment is indicated to reduce Mr. Raynor's symptoms and improve quality of life. Treatment options for symptomatic spinal stenosis and spondylolisthesis include non-operative and operative treatments. Nonsurgical and surgical treatment options are not mutually exclusive but are part of a continuum of care for the diagnosis of spinal stenosis and spondylolisthesis. Nonsurgical treatments generally include steroid or non-steroidal anti-inflammatory drugs, activity modifications, physical therapy, orthotic management, and spinal injections to reduce pain. Surgical treatment options include lumbar laminectomy (to decompress the neurologic structures) and fusion of the L4-5 segment (to stabilize the spondylolisthesis). Treatment options must take into consideration a patient's medical comorbidities which may increase risks for complications from either modality. Mr. Raynor's history of "vomiting blood" raises concern for development of gastrointestinal complications from traditional pharmacologic treatment such as non-steroidal anti-inflammatory drugs. Short term steroid treatments such as prednisone or methylprednisolone would also be indicated, however, these modalities can also be associated with increased gastrointestinal complications and weight gain. Activity modifications; avoidance of prolonged standing, arching of the lumbar spine, frequent breaks with ambulation, limited twisting and stooping, often help limit aggravation of symptoms. Physical therapy is generally recommended mostly for development of a flexion based stretching program, education for avoidance of movement patterns that exacerbate spondylolisthesis and development of flexion based cardiovascular fitness program (stationary cycling). Orthotic management (lumbar bracing) can be of utility in patients with spondylolisthesis to improve posture and decrease mechanical forces to the lumbar spine during bending or lifting tasks. The clinical efficacy of orthotic management is variable mostly due to appliance fit and compliance. Mr. Raynor's current body habitus will likely preclude efficacious orthotic management. Spinal injections under radiographic guidance are commonly performed as an additional modality to reduce

WEST END OFFICE 7858 SHRADER ROAD, RICHMOND, VA 23294
SOUTHSIDE OFFICES 13801 ST. FRANCIS BOULEVARD, SUITE 200, MIDLOTHIAN, VA 23114

PH (804) 270-1305 / FX (804) 273-9294 / WWW.ADVANCEDORTHO.ME

*EXHIBIT - D - 1 - PART (B)*

8 | Page





pain. Spinal injections allow introduction of an anti-inflammatory steroid medication at the area of stenosis and spondylolisthesis that can reduce localized inflammation and reduce symptoms. Spinal injections, however, do not alter the pathologic anatomy of lumbar stenosis and spondylolisthesis. The surgical treatment indicated for L4-5 spinal stenosis and spondylolisthesis is lumbar laminectomy (decompression of neural elements) and lumbar fusion (to stabilize the spondylolisthesis). Morbid obesity increases intraoperative surgical risks of hardware malposition, positioning neurologic palsies, spinal fluid leakage, and neurological injury from visualization difficulties, increased surgical time, and blood loss. After surgery, morbid obesity can increase risks of wound infection, hardware failure (breakage of screws and rods utilized for fusion), and adjacent segment disease. Sleep apnea additionally increases risks of respiratory complications in the perioperative period. Morbid obesity is not an absolute contraindication to surgical intervention; however, as a modifiable risk factor, weight reduction to BMI of 35 or less is recommended.

To summarize, recommended treatments would include initiation of either steroidal or non-steroidal anti-inflammatory medications. He will likely require monitoring for gastrointestinal complications while taking these medications. Gabapentin should also be resumed given its previous efficacy. A referral to an Interventional Pain Specialist should be made to consider trial of lumbar epidural steroid injections. It is generally accepted that patients can pursue up to three injections in a twelve month time period. Additional spinal injections such as medial branch blocks or facet blocks could also be pursued if recommended by the Interventional Pain Specialist. Mr. Raynor should also be counselled in nutrition to reduce overall body mass index. He should also be allowed to consult with a spine surgeon if the above measures do not improve symptoms. I would expect Mr. Raynor to improve with non-operative measures, however, symptoms are more likely than not to persist over time and surgical intervention will be medically indicated. A walker should be provided to assist with ambulation. Although walking with the walker is encouraged, he will likely not be able to tolerate long distances and should have access to wheelchair. Mr. Raynor should have living accommodations that allow for use of a wheelchair and walker while in his living quarters and the entrance should be wide enough to allow entrance/exit while in a wheelchair. Additional appliances to aid in routine activities of daily living, such as raised toilet seat and durable medical equipment to aid with self-care should be supplied.

It is my opinion that Mr. Raynor's ability to work is limited to light, sedentary work. His limited standing and ambulation tolerance should be accommodated in the workplace. He should have lifting maximum of 20 pounds, no stooping or repetitive bending or twisting. Grasping and reaching tasks would be unrestricted. Sitting type work with limited standing and walking should be accommodated.

WEST END OFFICE 7858 SHRADER ROAD, RICHMOND, VA 23294
SOUTHSIDE OFFICES 13801 ST. FRANCIS BOULEVARD, SUITE 200, MIDLOTHIAN, VA 23114

PH (804) 270-1305  /  FX (804) 273-9294 / WWW.ADVANCEDORTHO.ME



*11   Exhibit — B-2*



*(NO INJECTIONS, OR NO
SURGERY WAS HAS BEEN
DONE AT ALL.)*



It is my opinion that the total cost of Mr. Raynor's anticipated future medical care is estimated to be approximately $160,390.00.

This amount includes a lumbar spine fusion surgery, removal of spine lamina 1 lumbar, remove spinal lamina add-on, insertion of a spine fixation device, and bone graft in spinal fusion. The lumbar spine fusion surgery costs consist of hospital charges of $112,900.00 and physician charge for surgery of $24,000.00. The total cost for the spine fusion surgery is estimated to be approximately $136,900.00.

This amount also includes lumbar spinal epidural injections at L4-5 and L5-S1 three times a year for six years. The injections cost approximately $1,305.00. Thus, the total lifetime cost to Mr. Raynor of these injections is estimated to be $23,490.00.

It is my opinion that these expected charges are reasonable in price and value given my understanding of prevailing healthcare costs. My opinion in this regard is further supported by my experience as a licensed physician with an active clinical practice that treats patients with injuries similar to Mr. Raynor's and review of those patients' bills.

It is my further opinion that these future medical expenses are necessary and were caused by the injury Mr. Raynor suffered on January 10, 2013, as I explained earlier in this report.

It is anticipated that I will need to educate the jury concerning definitions, general anatomy, physiology, and pathophysiology necessary to explain and illustrate my opinions. I will also educate the jury generally regarding the medical issues in this case, which are pertinent to my opinions. I will rely upon demonstrative exhibits, including medical illustrations, diagnostic films, and/or models to educate the jury regarding my opinions. I will also rely on Mr. Raynor's MRI, x-rays, and medical records.

**Other Cases in Which I Have Testified in the Last Four Years:**

I have testified in six unrelated matters in the past four years. Those matters are:

**1.** *Athena A. Long v. Ameurfina F. Benedicta,* Virginia: Chesterfield County Circuit Court, Case No. CL13222184-00;

**2.** *Charlene Alexander v. James Allison II,* Virginia: Chesterfield County Circuit Court, Case No. CL130009:44-00;

**3.** *Janice Slyngard v. Ernest Lee Graham,* Virginia: Richmond City Circuit Court, Case No. CL13-526;

WEST END OFFICE 7858 SHRADER ROAD, RICHMOND, VA 23294
SOUTHSIDE OFFICES 13801 ST. FRANCIS BOULEVARD, SUITE 200, MIDLOTHIAN, VA 23114

PH (804) 270-1305 / FX (804) 273-9294 / WWW.ADVANCEDORTHO.ME



"BACK SPECIALIST"





4. *William Borum v. Wayne Douglas Grubbs,* Virginia: Hanover County Circuit

Court, Case No. CL13002532-00;

5. *Katherine Poe v. Joan Miles,* Virginia: Chesterfield County Circuit Court, Case

No. CL11002479-00; and

6. Jason Smith v. Peter Lynn Dudley and Dover Energy: United States District Court Western Division. Case No. 3: 15-cv-00007.

**Statement of Compensation to be Paid for Study and Testimony in this Case:**

I have attached a copy of my Legal Fee Schedule as Exhibit B to this report, and the fees identified on the Legal Fee Schedule are those applicable to my work, study, and testimony in this case.

The above are my opinions to within a reasonable degree of medical probability based on my review of the available records and radiographic imaging studies as well face-to-face interview and physical examination of Mr. James Raynor.

I understand discovery in this matter is ongoing and my opinions may change upon review of additional information obtained during the discovery process. Please feel free to contact me with any questions or concerns regarding this report.

Regards,

Adam C. Crowl, MD

Spine Disorder Center

Advanced Orthopaedics

**WEST END OFFICE** 7858 SHRADER ROAD, RICHMOND, VA 23294
**SOUTHSIDE OFFICES** 13801 ST. FRANCIS BOULEVARD, SUITE 200, MIDLOTHIAN, VA 23114

**PH** (804) 270-1305 / **FX** (804) 273-9294 / WWW.ADVANCEDORTHO.ME

----- ADAM C. CROWL----------------------------------------------------------------------------------------

Home Address
9729 Cragmont Drive
Richmond, VA 23238
(804)364-2824 (H) (804)855-4694(M) (804)270-1305 (W)
Email: acrowl@aocortho.com

Biographical Data
Date of Birth: 11/25/73
Birthplace: Hagerstown, MD

EDUCATION:   Fellowship, Spine Surgery
University of Pittsburgh School of Medicine
Pittsburgh, PA
Aug 2004-Aug 2005

Residency, Orthopaedic Surgery
University of Virginia School of Medicine
Charlottesville, VA
Jun 2000-Jun 2004

Internship, General Surgery
University of Virginia School of Medicine
Charlottesville, VA
Jun 1999- Jun 2000

M.D., University of Virginia School of Medicine
Charlottesville, VA
Aug. 1995-May 1999

B.S., James Madison University
Harrisonburg, VA
Major: Psychology  Minor: Biology
Aug. 1991-May 1995

HONORS/AWARDS:
University of Virginia School of Medicine
- Pfizer Scholar in Pain Management Award (2004)
- Resident Teaching Award Nominee(1999/2000, 2000/2001)
- Raven Scholar Award Nominee  (1998)
- Alpha Omega Alpha (inducted as a junior, 1997)
- Pathology Honor Society (1997)

James Madison University
- Suma Cum Laude graduate
- Phi Kappa Phi
- President's List (4 semesters)
- Dean's List (2 semesters)
- Beta Beta Beta (Biology Honor Society, inducted 1994)
- Who's Who Among American College Students (1993, 1994)
- Outstanding Student in Vertebrate Physiology (1993)
- President of Alpha Epsilon Delta (Pre-medical Honor Society, 2 years)
- Vice-President of Psi Chi (Psychology Honor Society-1 year)
- Golden Key Honor Society (inducted 1992)

BOARD EXAMINATIONS:  AAOS MOC recertification –March 2016 (certified until 2027)
AAOS Board since Certified 2007
ABOS Part 1- Pass (7/04)
USMLE Part-I- 241;  98th  percentile(6/97)
USMLE Part-II- 251  99th percentile(8/98)
USMLE Part-III- 234 95th percentile (8/01)

UNDERGRADUATE
EXAMINATIONS:          MCAT: Biological Sciences  13
Physical Sciences     10
Verbal Reasoning     10
Writing Sample        R

RESEARCH&
PUBLICATIONS:

Tannoury T, Crowl AC, Battaglia T, Anderson DG, Chan DP.  A cadaveric study comparing standard fluoroscopy with fluoroscopy-based computer navigation for screw fixation of the odontoid.  (To be published in *Journal of Southern Orthopaedic Advances*, winter 2005).

Crowl AC, Kang JD.  Cervical Spine.  Chapter 15.  2005

Crowl AC, Kang JD.  Lumbar spine injuries in athletes.  2005

Crowl AC. Revision spine surgery. In Decision making in Spinal Surgery. Eds. Vaccaro J & Anderson DG. 2005

Crowl AC, Anderosn DG. *Anterior Spinal Instrumentation*. In Spine Secrets, 1st edition, Hanley and Belfus, Philadelphia;2004.

Crowl AC, Anderson DG. *Posterior Spinal Instrumentation*. In Spine Secrets, 2nd edition, Hanley and Belfus, Philadelphia;2004.

Crowl AC, Kahler DM. Closed reduction and percutaneous fixation of the anterior column acetabular fractures. *Comp Aid Surg* 2002:7:3:169-178.

Tannoury T, Crowl AC, Battaglia T, Anderson DG, Chan DP. An anatomic study comparing placement of C1-2 transarticular screws with conventional versus virtual fluoroscopy.  Journal of Neurosurgery Spine, March 2005.

Anderson DG, Crowl AC. *Spinal Trauma*. In Orthopedic Secrets, 2nd edition, Hanley and Belfus, Philadelphia; 2002.

Shen FH, Crowl AC, Shuler TE, Feldenzer JA et al.  Traumatic lumbosacral fracture-dislocations after logging injuries. (2003) (accepted to *Journal of Trauma*).

Crowl AC, Young JS, Kahler DM, Claridge JA, et al. Occult hypoperfusion is associated with increased morbidity in patients undergoing early femur fracture fixation.  *J Trauma* 2000:48:2:260-266.

Chhabra, A (Ed.), Crowl AC.  Contributing author: *Neurosurgery, Burns, Trauma, Surgical Intensive Care, Plastic Surgery, Cardiovascular Surgery, Thoracic Surgery*. In Surgical Recall, 3rd edition, Lippincott, Baltimore; 2000.

PRESENTATIONS:

"Surgical         decision         making         in         Cervical         Spine         Surgery:
"How to avoid doing too little without doing too much" presented at University of Virginia Orthopaedic
Grand Rounds, Charlottesville, VA September 21, 2005.

> *"Closed Reduction and Percutaneous Fixation of the High Anterior Column Acetabular Fracture"*
> presented at the American Academy of Orthopaedic Surgeons Meeting, New Orleans, LA
> February 4-9,2003.

> *"Closed Reduction and Percutaneous Fixation of the High Anterior Column Acetabular Fracture"*
> presented at the 55[th] Annual Virginia Orthopaedic Society Meeting, *Hot Springs, VA*. May 17-19,
> 2002.

> *"Surgical Management of Lumbosacral Fracture Dislocations"* presented at the 32[nd] Annual
> Eastern Orthopaedic Association Meeting, *Southampton, Bermuda.* October 10-14, 2001.

> *"Occult hypoperfusion is Associated with Increased Morbidity in Patients Undergoing Early
> Femur Fracture Fixation"* presented at the 52[nd] Annual Virginia Orthopaedic Society Meeting,
> *Williamsburg, VA* May 20-22, 1999.

EXTRACURRICULAR/LEADERSHIP/COMMUNITY SERVICE:
University of Virginia School of Medicine

- National Contestant- Experimental and Applied Science (EAS) Challenge (2001)
- Habitat for Humanity (1999)
- AP Biology experience, Charlottesville City High School, (1999)
- AOA Executive Board (1998)
- Peer Tutorial Program (Tutored anatomy, pathology and neuroscience, 1998)
- Environmental Defense Campaign (1998)
- Provided Sports Physicals for Albemarle and Frederick County and Winchester City Schools (1997-2002)
- Pediatrics Club (1995)
- Christian Medical Fellowship (1995-present)
- Spinal Chords (Male a cappella singing group, 1995-1997)
- American Drug Free Powerlifting Association (1995-present)
- American Powerlifting Federation (1998)
- Curriculum Review of Medical Physiology (1996)
- Created Summer Shadowing Experience (Orthopaedic Surgery, Neurosurgery, Pediatrics)
- Brownsville Church of Brethren Youth Advisor (1996)
- Intramural Volleyball Team (1995)

James Madison University
- Alpha Epsilon Delta (President, Secretary : 1994-1995)
- Psi Chi (Vice President: 1994)
- Beta Beta Beta (active member 1994-1995)
- Baptist Student Union (active member 1991-1993)
- Brownsville Church of the Brethren Youth Advisor (1994)
- Habitat for Humanity (active member 1994)
- American Drug Free Powerlifting Association (competitor in 198 and 220 lb. classes, 1993-1995)
- Created Summer Shadowing Experience (Orthopaedic Surgery, Pediatrics; 1992-1994 (summers))

EMPLOYMENT:
- AO/ASIF Spine-Clinical Instructor (2003)
- Scientific Advisory Board, Netrition Superstores(1999-present)
- Peer Tutorial Program (Tutored anatomy, pathology and neuroscience, 1998-1999)
- Assistant Instructor of Anatomy, Minority Advancement Program at UVA (summer 1996)
- Director of First Aid, Greenbrier State Park (summer 1994, 1995)
- Senior Lifeguard, Greenbrier State Park (summer 1993)
- Junior Lifeguard, Greenbrier State Park (summer 1992)
- Advanced Orthopaedic Centers 2005-present
- Vice Chairman, Dept. of Orthopaedics, Henrico Doctors Hospital, Richmond, VA 2008-2013
- Chairman, Dept. of Orthopaedics, Henrico Doctors Hospital, Richmond, VA 2013-present.
- Advanced Orthopaedic Centers-A Division of OrthoVirginia July 2016-present

PROFESSIONAL MEMBERSHIPS:
- Cervical Spine Study Group-Sofamor Danek (2004)
- Alpha Omega Alpha Executive Board
- American Academy of Orthopaedic Surgeons
- Eastern Orthopaedic Association
- Virginia Orthopaedic Society
- American Medical Association
- Medical Society of Virginia, University of Virginia Chapter- Previous Secretary 2003-2004
- Cervical Spine Research Society

PERSONAL DATA:
- Outside interests:  spending time with family -3 boys (7, 4 and 18 months) and 1 girl (6 months), reading scripture, music-guitar (in band with several of my work colleagues: SPINAL FUSION),
- Sports – weightlifting, soccer/baseball and basketball with my boys
- UPDATED:  July 2016

 

### LEGAL FEE SCHEDULE

| DATE: | | PHYSICIAN: |
|---|---|---|
| **TO:** | | |
| **RE:** | **DOB:** | |

**All fees must arrive in the office two weeks prior to the appointment. For any ATTORNEY appointment that is cancelled with less than five (5) working days notice, the prepaid fee will be forfeited. The following list outlines our fees for expert medical legal work. The amounts below are guidelines and individual physicians may determine if a greater fee is warranted.**

1. **Narrative summary or report by the physician: $ 400.00**
   **(Also includes Questionnaires/check off sheets)**

   **ANY TIME SPENT BEYOND 30 MINUTES IS AN ADDITIONAL $200 PER QUARTER HOUR**

2. Impairment Rating: $ 400.00

3. Impairment Rating and Narrative Summary: $ 800.00

4. IME Evaluation: $ 3,500.00

   **IME RECORD REVIEW WITH MORE THAN 1 INCH OF FULL SIZE RECORDS (1 inch is included with the IME fee) $800 HOUR IN QUARTERLY SEGMENTS**

   **FOR IME CANCELLATIONS, ADVANCE NOTICE OF 3 BUSINESS DAYS IS REQUIRED. THE MEDICAL RECORD REVIEW FEE ($800 PER HOUR) WILL NOT BE REFUNDED IF THE REVIEW WAS COMPLETED PRIOR TO THE CANCELLATION.**

   **THE MEDICAL RECORD REVIEW FEE WILL NOT BE REFUNDED IF THE PATIENT IS A NO SHOW. IF THE PATIENT IS RESCHEDULED AND IS A NO SHOW A SECOND TIME, THE ENTIRE IME FEE WILL NOT BE REFUNDED.**

5. Medical record review (without examination – non office patient)

   **Verbal Report:**

   **$800/HOUR IN QUARTERLY SEGMENTS FOR THE REVIEW AND TIME SPENT RENDERING OPINIONS.**
   **One hour minimum and pre-payment is required.**

   **Written Report:**

   **$800/HOUR IN QUARTERLY SEGMENTS FOR THE REVIEW AND TIME WRITING REPORT.**
   **One hour minimum and pre-payment is required.**

6. To study, review or prepare reports for a pre-trial conference or deposition:

   First hour or any portion thereof:     $ 800.00

| DATE: | PHYSICIAN: |
|---|---|

| RE: | DOB: |
|---|---|

Each subsequent quarter hour:      $ 200.00

7.  Legal consultation in the office or telephone:   $ 200.00 (per quarter hour)

**PREPARATION TIME SPENT TO PREPARE FOR THE CONSULTATION WILL BE BILLED AT SAME RATE.**

8.  Court deposition, video deposition per hour:        $ 1,000.00
    First hour or any portion thereof:          $ 1,000.00
    Each subsequent quarter hour segment:   $ 250.00

9.  In-court appearance :   $ 10,000.00

    (Minimum one-half day plus travel expenses)
    Each subsequent hour over one-half day, 1 hour minimum segments:  $ 1000.00
    Half day is defined as 4 hours or less.


**Total Due:**      $ _____


**I agree to the above fee schedule as set-forth by Advanced Orthopaedics/OrthoVirginia
Tax ID# 54-0885859**


_____            _____
**Signature**                                **Date**

## _A signed copy of this schedule must accompany payment._

Page 2 of 2

Ms. Margo L. Frasier J. D.

Sworn Affidavit, in a civil action no. Raynor v. Pugh
# 1-13-CV-01117-LMB-JFA

# EXHIBIT B

EXPERT WITNESSES

THAT PROVES PLAINTIFF'S
8Th AMENDMENT Right's WAS Broken
BY DEFENDANT'S AT SUSSEX II S.P. AND
VA. D.O.C.

("EXPERT WITNESS")

MARGO L. FRASIER, J.D.
3300 PLOVER RAIN WAY
PFLUGERVILLE, TEXAS 78660

July 31, 2016

Ms. Ashley W. Winsky
McGuire Woods, LLP
310 Fourth Street, N.E., Suite 300
Charlottesville, Virginia 22902

Re:  *James Raynor v. G. Pugh, in his individual capacity,* in the United States District
Court, Eastern District of Virginia, Alexandria Division, Civil Action No. 1:13-
CV-01117-LMB-JFA

## REPORT OF PLAINTIFF'S EXPERT,
## MARGO L. FRASIER, J.D.,

**INTRODUCTION:**

My name is Margo Frasier. I am presently self-employed as a criminal justice consultant and
expert. I have been retained as an expert witness for James Raynor (Plaintiff) in the matter of
*James Raynor v. G. Pugh, in his individual capacity,* in the United States District Court, Eastern
District of Virginia, Alexandria Division, Civil Action No. 1:13-CV-01117-LMB-JFA.

I have been asked to render opinions relating to the actions of G. Pugh (Defendant) in connection
with the incident which occurred on January 10, 2013, when Plaintiff was assaulted by another
inmate while incarcerated in the Sussex II State Prison. Specifically, Plaintiff claims his rights
were violated due to the Defendant's failure to protect Plaintiff from inmate K. Mullins (Mullins).

Specifically, I have been asked to review documentary material related to the actions of the
Defendant in connection with the incident, the pleadings of the parties, and relevant training,
regulations, statutes and case law for the purpose of determining whether the Defendant subjected
Raynor to a violation of his constitutional rights based on my training, knowledge, and experience,
and whether the Defendant violated the applicable standard of care in taking no action to protect
Raynor from an imminent and serious assault.

**QUALIFICATIONS OF EXPERT:**

I have significant experience in all facets of law enforcement and corrections. Presently, I am self-
employed as a criminal justice consultant and expert. I have served as a subject matter expert in
law enforcement and corrections for the Special Litigation Section of the United States Department

1

of Justice in Franklin County, Ohio; Suffolk County, New York; Alamance County, North Carolina; and Maricopa County, Arizona. In addition, I currently serve as a court appointed monitor of the consent decree for the jail system in Orleans Parish, Louisiana. Amongst other provisions of the consent decree, I monitor the provisions related to the protection of inmates from harm by other inmates. Additionally, I am employed as the Police Monitor for the City of Austin. My duties as Police Monitor include overseeing all of the internal affairs investigations of the Austin Police Department and providing recommendations on how to improve the Austin Police Department. Prior to joining the City of Austin, I was a Senior Associate with MGT of America, Inc., where I provided litigation support, expert witness services, and consulting in criminal justice issues. Prior to joining MGT, I was an Assistant Professor of Criminal Justice in the College of Criminal Justice at Sam Houston State University in Huntsville, Texas. Prior to joining the faculty at Sam Houston State University, I was the duly elected Sheriff of Travis County (Austin), Texas. I assumed office as Sheriff of Travis County, Texas, on January 1, 1997, and served as the Chief Law Enforcement Officer and Chief Corrections Officer of Travis County, Texas, until December 31, 2004.

I graduated from Sam Houston State University with a Bachelor of Science degree with honors in Criminology and Corrections in 1974. I received thirty hours of credit towards a Masters of Arts degree in Criminal Justice Management from Sam Houston State University. I received my Juris Doctor with high honors from Florida State University College of Law in 1984. I am certified both as a peace officer and jail officer by the Texas Commission on Law Enforcement Officer Standards and Education. I am licensed as an attorney in the State of Texas.

During my 40 years of experience, I have worked at a state prison in Texas; worked in a number of different capacities within the Travis County Sheriff's Office; worked at and managed a county jail system; worked for the legislative committee which provided oversight of the jail and prison systems of the State of Florida; represented, as an attorney, numerous cities, counties, city officials and county officials in litigation related to law enforcement, corrections, and employment law; served as Sheriff, and, therefore, Chief Law Enforcement Officer and Chief Corrections Officer, of Travis County, Texas; provided criminal justice consultation; served as a court appointed monitor; and served as Police Monitor of the City of Austin.

In addition, from 1997 to 2004, I was on the faculty at Saint Edward's University in Austin, Texas. At Saint Edward's University, I taught criminal justice courses including courses on American Policing, Corrections, and Juvenile Justice. While on the faculty at Sam Houston State University from 2005 to 2008, I taught criminal justice courses including Criminal Law, Criminal Investigation, Professionalism and Ethics in Criminal Justice, Legal Aspects of Corrections, Seminar on Administration and Organization, and Legal Aspects of Criminal Justice Management. Specifically, as part of the courses on Legal Aspects of Criminal Justice Management and Legal Aspects of Corrections, I taught the legal principles related to the liability of criminal justice agencies for the actions of their employees and liability of employees; specifically, those related to issues of training, supervision, and duty to protect.

I have extensive experience and have provided consulting, instructional, and legal services in such areas as training, classification, security, duty to protect, search and seizure, supervision of staff, inmate rights, mental health laws, employment matters, and employee discipline. My experience

2

includes instructing at the National Sheriffs' Institute and the Southwest Florida Jail Leadership Institute. I have developed and implemented policies and procedures which relate to almost every aspect of the operation of a law enforcement agency and a correctional agency. I am familiar with the laws of the United States which relate to the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. I am particularly familiar with the duties imposed upon an officer to protect inmates from harm. I have extensive experience in analyzing a particular incident that has occurred in an employment setting, law enforcement setting, or corrections setting to determine whether public officials acted in accordance with accepted procedures consistent with competent law enforcement and corrections training and the laws and Constitution of the United States and whether law enforcement/corrections officials have acted outside the range of acceptable law enforcement/corrections discretionary acts.

As the Sheriff of Travis County, Texas, I was the head of an agency which employed over 1300 employees and had a budget for 2004-2005 of over $90 million dollars. As the Chief Law Enforcement Officer and Chief Corrections Officer, I was directly responsible for the supervision of the jail and supervision of law enforcement officers patrolling, investigating, and enforcing criminal laws within Travis County. Additionally, I was directly responsible for the oversight of the employment and training practices of the Sheriff's Office to insure compliance with state and federal statutes and the United States Constitution. As the Police Monitor of the City of Austin and as a former Sheriff and Assistant Professor of Criminal Justice, I am familiar with the laws which relate to employees of law enforcement and corrections agencies and the liability of law enforcement and corrections officers; specifically, those laws related to issues of training, supervision, search and seizure, and duty to protect.

During my time as Sheriff, I was a member of the Sheriffs' Association of Texas, National Sheriffs' Association, the Major County Sheriffs' Association, and the National Executive Institute Associates. I was elected to the Board of Directors of the National Sheriffs' Association by a vote of the membership in 2002 and served through 2004. I was elected to be the Treasurer of the Major County Sheriffs' Association by a vote of the membership in 1999 and served as treasurer through 2001. I was elected to be the Vice-President of the Major County Sheriffs' Association by a vote of the membership in 2002 and served as Vice-President through 2003. I was elected to be the President of the Major County Sheriffs' Association by a vote of the membership and served as President during 2004. I was twice selected by the Combined Law Enforcement Associations of Texas as the Administrator of the Year for the State of Texas.

Details of my experience and education, including a list of all publications that I authored in the last ten years, may be found in my resume attached hereto as **Exhibit A**. A list of all other cases in which, during the previous four years, I have testified as an expert at trial or by deposition, is attached hereto as **Exhibit B**.

**COMPENSATION:**

I am being compensated for my time at a rate of $300.00 per hour.

3

## METHODOLOGY:

In arriving at my opinions, I have considered the following:

1. Plaintiff's Civil Complaint (Document 1);
2. Informal Complaint, dated 01/18/2013, with 01/23/13 response;
3. Informal Complaint, dated 01/19/2013, with 01/23/13 response;
4. Regular Grievance, dated 02/6/2013;
5. Offender Grievance Response—Level I, 02/27/13, with Raynor 02/28/13 response;
6. Raynor Appeal, dated 02/28/13;
7. Offender Grievance Response—Level II, 03/25/13 (Document 1-3);
8. Answer of G. Pugh (Document 20);
9. Affidavit of G. Pugh (Document 22-1);
10. Memorandum in Support of Motion for Summary Judgment (Document 22);
11. Motion to Submit Case Law in Support of Plaintiff's Claims (Document 31);
12. Motion to Submit Declaration for Written Affidavit by Elvis Alexander (Document 32);
13. Plaintiff's Response to Defendant's Twelfth Defenses (Document 35);
14. Affidavit to Motion to Dismiss Defendant's Motion for Summary Judgment for Qualified Immunity and attachments (Document 37);
15. Affidavit for Preliminary Injunction and Temporary Restraining Order (Document 40);
16. Plaintiff's Motion for Summary Judgment (Document 42);
17. Affidavit of Darryl Jones (Document 46);
18. Affidavit of Joseph Jackson (Document 11-1);
19. Offender Request 03/26/2014 and exhibits (Document 40.1);
20. Affidavit for Order Compelling Discovery (Document 44);
21. Answer to Amended Complaint (Document 79);
22. Declaration of Joseph Jackson;
23. Declaration of Christopher McManama;
24. Declaration of Darryl Jones;
25. Declaration of John Smith;
26. Declaration of Joseph Francisco;
27. Declaration of Kunta Kinte Mullins;
28. Declaration of Tony Brooks;
29. Defendant Gerard Pugh's Response to Plaintiff's First Set of Interrogatories;
30. Defendant Gerard Pugh's First Amended Response to Plaintiff's First Set of Interrogatories;
31. Defendant Gerard Pugh's Response to Plaintiff's First Set of Requests for Admission;
32. Defendant Gerard Pugh's First Amended Response to Plaintiff's First Set of Request for Admissions;
33. Amended Complaint (Document 76);
34. Mullins' Disciplinary Offense Report;
35. Operating Procedure 38.1 (Reporting Serious or Unusual Incidents), effective 5/1/2008;
36. Operating Procedure 38.1 (Reporting Serious or Unusual Incidents), effective 9/1/2013;
37. Operating Procedure 420.1 (Use of Force), effective 5/1/2007;
38. Operating Procedure 420.1 (Use of Force), effective 7/1/2013;
39. Library of Virginia Records Retention and Disposition Schedule, Specific Schedule No.

4

701-100, Department of Corrections, All Correctional Institutions; and
40. Relevant case law.

Additionally, I have examined the conduct of the Defendant in light of my experience as a corrections officer, administrator, and educator. The opinions set forth herein are based upon analysis of these facts by applying my law enforcement, corrections, administrative and teaching experience; legal education; training; and personal knowledge of the applicable amendments to the United States Constitution.  My opinions are also based on my understanding of the facts and circumstances concerning the actions of the Defendant, evidenced by the materials I have examined and my personal training and experience, particularly in law enforcement and corrections training, in the events of which Plaintiff complains.

In particular, my opinions are based on:

- Raynor being an inmate who had several medical issues which made it difficult for him to care for himself without assistance;
- Raynor having been placed in a cell with Mullins in 1B-Pod in November, 2012, upon Raynor's return from a hospital visit;
- Mullins having been in the same cell for over two years;
- It being well known that inmates consider their cells to be their "house" and often resent having to move;
- Defendant having served as the Housing Unit I Manager for 1B-Pod;
- Raynor having requested of Defendant on numerous occasions that he be allowed to return to his previous cell assignment or that he be allowed to move into a cell with an inmate who had agreed to be his caretaker;
- Defendant having told Mullins that he would be required to move from the cell that he had occupied for over two years and move to an upper tier cell;
- Raynor having told Defendant that he did not want to force Mullins to move as Raynor understood that Mullins had been in the cell for over two years and did not want to move;
- It not having been necessary for Mullins to move in order to accommodate Raynor;
- Defendant having told Raynor that it was "on him" that Mullins was having to move and Defendant having threatened to place Mullins in segregation if he did not move;
- Mullins, by his own admission, and as witnessed by several persons, having told Defendant in no uncertain terms that he would assault Raynor if he was required to move;
- Defendant having told Mullins that he did not care if Mullins assaulted Raynor, that Mullins had to move, and "to do what you have to do";
- Defendant, despite having been told by Mullins that Mullins intended to assault Raynor, not having taken any action to restrain Mullins or remove him from the housing unit before he could harm Raynor's property or person;
- Defendant, despite having been told by Mullins that Mullins intended to assault Raynor, not having taken any action to protect Raynor or remove him from the housing unit before Mullins could harm Raynor;
- Defendant having witnessed Mullins destroying Raynor's property and throwing Raynor's property out of the cell;
- Despite Defendant having witnessed Mullins destroying Raynor's property and throwing Raynor's property out of the cell, Defendant having done nothing to intervene and protect

5

Raynor from an assault that had been promised;
- Mullins having carried out his promise to assault Raynor by violently striking Raynor in the face multiple times;
- Mullins having struck Raynor with such force that he knocked Raynor to the ground and caused Raynor to bounce off the ground;
- Defendant having witnessed Mullins striking Raynor;
- Despite Defendant having witnessed Mullins striking Raynor, Defendant having done nothing to intervene and protect Raynor from the assault;
- Defendant having been observed by multiple witnesses smiling and/or smirking as he witnessed Mullins destroy Raynor's property and assault Raynor and did nothing to intervene and protect Raynor;
- Defendant having been observed by multiple witnesses having a radio on his person, and the ability to utilize the radio to call for assistance, but Defendant at no time utilized his radio to call for assistance;
- Raynor having suffered a serious permanent injury as a result of the assault;
- Raynor having filed an informal complaint and formal grievances regarding the Defendant's failure to protect him;
- Raynor having requested in a formal grievance submitted to the institution that any video of the incident be saved, and Raynor having identified the video as proof of his assault in a complaint submitted to the institution and signed by the Defendant; and
- No thorough investigation having been conducted.

My opinions are also based on my review and study of the materials listed and an ongoing review of professional and scholarly literature regarding the duties and responsibilities of Sheriffs, Chiefs, law enforcement officers, and corrections officials and employees and legal requirements, including the National Criminal Justice Reference Service, the Justice Quarterly, the Police Quarterly, the studies that are conducted by the Police Executive Research Forum (PERF), the Federal Civil Practice Bulletin, and the magazine publications of the National Sheriff's Association, the International Association of Chiefs of Police, and the American Jail Association.

I have analyzed the actions of Defendant in light of the Constitution of the United States and the clearly established duty of corrections officials and employees to protect inmates.

**OPINIONS:**

1. There is information and evidence in the record I have analyzed indicating that Raynor's rights under the Eighth Amendment to the United States Constitution were violated by the Defendant. Particularly, there is information and evidence that Defendant was aware, before the assault on Raynor, that Mullins posed a substantial risk to Raynor in that Mullins posed a clear and immediate danger to the life and safety of Raynor. There is also information and evidence that Defendant knew, before the assault on Raynor, that Mullins intended to harm Raynor and that Defendant deliberately chose to ignore the risk and do nothing to prevent it and protect Raynor. Specifically, Mullins told Defendant in no uncertain terms that he would assault Raynor if he were required to move, but Defendant did nothing to prevent the imminent assault from occurring. Based on my training, experience, and familiarity with standards

6

regarding inmate protection, no reasonable corrections official or employee in Defendant's position could have concluded, based on the circumstances and threats by Mullins, that Raynor was not at substantial risk of harm at the hands of Mullins, and that there was no duty to take action to protect Raynor, including by immediately removing either Mullins or Raynor from the situation.

2. There is information and evidence in the record I have analyzed indicating that Raynor's rights under the Eighth Amendment to the United States Constitution were violated by the Defendant. Particularly, there is information and evidence that Defendant was aware, before the assault on Raynor, that Mullins posed a substantial risk to Raynor in that Mullins posed a clear and immediate danger to the life and safety of Raynor. There is also information and evidence that Defendant knew, before the assault on Raynor, that Mullins intended to harm Raynor and that Defendant deliberately chose to ignore the risk and do nothing to prevent it and protect Raynor. Specifically, Mullins began destroying Raynor's property and throwing Raynor's property out of the cell that they occupied, but Defendant did nothing to prevent the imminent assault from occurring. Based on my training, experience, and familiarity with standards regarding inmate protection, no reasonable corrections official or employee in Defendant's position could have concluded, based on the circumstances and the destruction of Raynor's property by Mullins, that Raynor was not at substantial risk of harm from Mullins, and that there was no duty to take action to protect Raynor, including by immediately removing either Mullins or Raynor from the situation.

3. There is information and evidence in the record I have analyzed indicating that Raynor's rights under the Eighth Amendment to the United States Constitution were violated by the Defendant. Particularly, there is information and evidence that Defendant was aware of the assault on Raynor and that Mullins posed a substantial risk to Raynor in that Mullins posed a clear and immediate danger to the life and safety of Raynor. There is also information and evidence that Defendant knew as a result of the assault on Raynor that Mullins had harmed and continued to harm Raynor and that Defendant deliberately chose to ignore the risk and do nothing to intervene and protect Raynor. Specifically, Mullins began assaulting Raynor, but Defendant did nothing to intervene and prevent the assault from continuing. Based on my training, experience, and familiarity with standards regarding inmate protection, no reasonable corrections official or employee in Defendant's position could have concluded, based on the circumstances and the assault of Raynor by Mullins, that Raynor was not at substantial risk for harm at the hands of Mullins, and that there was no duty to take action to immediately remove either Mullins or Raynor from the situation.

4. There is information and evidence in the record that I have analyzed to indicate that Defendant was aware of a substantial risk of serious harm to Raynor prior to the assault by Mullins.

5. There is information and evidence in the record that I have analyzed to indicate that a substantial risk of serious harm to Raynor did exist and that Defendant drew the inference that Mullins posed a substantial risk to Raynor and chose to ignore the risk.

7

6. Defendant's failure to intervene and reasonably respond to the threats and assault, including but not limited to, according to witness accounts, his failure to utilize the radio on his person to request immediate assistance, resulted in serious and significant injuries to Raynor.

7. Based on my training, experience, and familiarity with standards regarding investigations in correctional facilities, given the allegations in Plaintiff's grievance and the seriousness of the assault and the resulting injury, a thorough investigation should have been conducted by the institution.

8. Based on my training, experience, and familiarity with standards regarding responses to incidents in correctional facilities, an appropriate institutional response should have included actions to retain video and other evidence consistent with applicable retention policies and/or pursuant to any legal obligation relating to evidence preservation.

My opinions are based on the pleadings and the current state of discovery, which I understand is ongoing. I reserve the right to modify my opinions should additional information and evidence be discovered so as to justify such modification. Specifically, as I understand that the transcript of the deposition of the Defendant is not available, I reserve the right to modify my opinion upon reviewing that deposition transcript.

Sincerely,

Margo L. Frasier, J.D., C.P.O.

8

### MARGO FRASIER
### 3300 PLOVER RAIN WAY
### PFLUGERVILLE, TEXAS
### 512-565-0464

## RANGE OF EXPERIENCE

Margo Frasier has over 40 years of experience in the corrections and law enforcement field. Currently, Ms. Frasier is the Police Monitor for the City of Austin.   Ms. Frasier also provides litigation support and consulting in criminal justice.   Ms. Frasier has served as a subject matter expert in law enforcement and corrections for the Special Litigation Section of the United States Department of Justice in Franklin County, Ohio, Suffolk County, New York, Alamance County, North Carolina, and Maricopa County, Arizona.   In addition, she serves as a court appointed monitor of the consent decree in Orleans Parish, Louisiana.

Ms. Frasier served as the sheriff of Travis County, Texas from 1997 through 2004, the first woman to hold the office where she started as a deputy more than two decades earlier. As sheriff, she oversaw 1,350 officers and other employees with a budget of more than $90 million and earned praise for her leadership of the jail system, which housed 2,400 inmates and the implementation of community policing. Since leaving office, Ms. Frasier worked as an assistant professor in the College of Criminal Justice at Sam Houston State University in Huntsville, Texas and a Senior Associate for MGT of America, Inc., before joining the City of Austin as its Police Monitor. Over the years, as a consultant and an attorney, she has provided expert testimony in matters involving criminal justice including civil rights, employment law, law enforcement practices, and corrections practices.

Ms. Frasier served as treasurer, vice-president, and president of the Major County Sheriffs' Association. She also served on the boards of the National Sheriff's Association, National Center for Women and Policing, Texas Institute for Public Problem Solving, and the Children's Advocacy Center of Central Texas.  In addition, she was recognized twice by the Combined Law Enforcement Association of Texas as Administrator of the Year. She also received a Lifetime Achievement Award from the National Center on Women in Policing.

## PROFESSIONAL AND BUSINESS HISTORY

Margo L. Frasier, J.D., Consultant, January 1997 – Present.

City of Austin, Police Monitor, January 2011—Present.

MGT of America, Inc., Senior Associate, July 2008 – January 2011.

Sam Houston State University, Assistant Professor, January 2005 – July 2008.

Travis County Sheriff's Office, Sheriff, January 1997 – December 2004.

St. Edward's University, Assistant Professor (Part-time), January 1997 – December 2004.

Bickerstaff, Heath, LLP, Partner, January 1991 – December 1996.

Brown Maroney (Now Brown McCarroll), Associate, January 1985 – December 1991.

| |
|---|
| **YEARS OF EXPERIENCE:** 40+ in criminal justice |
| **EDUCATION:** |
| Bachelor of Science in Criminology & Corrections, Graduated with Honors, Sam Houston State University, 1974 |
| Juris Doctor, Graduated with High Honors, Florida State University College of Law Tallahassee, Florida, 1984 |

U.S. District Court, Tallahassee, Florida, Law Clerk (Intern), September 1984 – December 1984.

Florida Senate Committee on Criminal Justice,   Legislative Analyst, August 1983 – July 1984.

Travis County Sheriff's Office, Austin, Texas, Captain, October 1975 – August 1982.

Austin Community College, Austin, Texas, Instructor, September 1980 – May 1982.

Texas Department of Corrections, Huntsville, Texas, Corrections Officer, May 1974 – May 1975.

## PROFESSIONAL AND BUSINESS EXPERIENCE

Consultant in litigation matters involving law enforcement and corrections related to civil rights, employment law, law enforcement practices, and corrections practices.

Subject matter expert for the Special Litigation Section of the United States Department of Justice.

Court appointed monitor of the consent decree in Orleans Parish, Louisiana.

Police Monitor for the City of Austin which assesses citizen complaints, monitors internal affairs investigations, and monitors and makes recommendations on policies, procedures, and discipline.

Consultant at MGT of America, Inc., in criminal justice regarding law enforcement agencies and correctional facilities.

Assistant Professor in the College of Criminal Justice at Sam Houston State University. Undergraduate courses taught include Fundamentals of Criminal Law, Legal Aspects of Corrections, Professionalism and Ethics, and Criminal Investigation. Graduate courses taught include Seminar in Organization and Administration and Legal Aspects of Criminal Justice Management.

Sheriff of Travis County, Texas. Assumed office as the first female sheriff in Travis County history in January 1997. Served as the Chief Law Enforcement Officer and Chief Corrections Officer of Travis

2

County. The Travis County Sheriff's Office is an agency of over 1,350 employees with a 2004 budget of over $90 million. It is a full service sheriff's office which patrols over 700 square miles and operates a jail system which houses over 2,400 inmates.

Assistant Professor in the College of Behavioral Sciences at St. Edward's University on a part-time basis. Courses taught included American Policing and Corrections.

Partner at the law firm of Bickerstaff, Heath LLP. Primary practice involved the representation of local government clients, including school districts, police departments, and sheriff's offices in civil rights and employment law matters.

Associate at the law firm of Brown Maroney (Now Brown McCarroll). Primary practice was general litigation with an emphasis in litigation involving representation of local government clients, including school districts, police departments, and sheriff's offices in civil rights and employment law matters.

Interned as a law clerk for U.S. District Judge Maurice Paul.

Interned as a legislative analyst for the Florida Senate Committee on Criminal Justice. Drafted and analyzed legislation in the area of criminal justice.

Served as Captain for the Travis County Sheriff's Office, Texas. Progressed through the ranks from deputy sheriff/corrections officer to captain with five years of service as captain. Main duties included management of jail system and coordination with Commissioners' Court.

Adjunct Instructor at Austin Community College. Adjunct Instructor in criminal justice on a part-time basis. Classes taught included Introduction to Criminal Justice and Corrections.

Corrections officer for the Texas Department of Corrections. Duties included maintenance of security and supervision of inmates in a maximum security prison.

## AWARDS

Lifetime Achievement Award, National Center on Women in Policing, 2003

Community Service Award, NAACP, Austin Chapter, 1999 and 2000

Recognition for Being Outstanding Role Model, Austin Area Urban League, 2000

Breaking the Glass Ceiling Award, National Center on Women in Policing, 1999

Administrator of the Year, Combined Law Enforcement Association of Texas, 1998

Bridge Builder of the 21st Century, National Women of Achievement, Inc., 1997

Administrator of the Year, Combined Law Enforcement Association of Texas, 1997

Correctional Officer of the Year, National Jail Association, 1981

## PROFESSIONAL ACCOMPLISHMENTS

Major County Sheriffs' Association (President, 2004; Vice-President, 2002-2003; Treasurer, 1998-2001)

National Sheriff's Association (Board of Directors, 2002-2004)

SafePlace Foundation, Board of Trustees (1997-2004)

Big Brothers/Big Sisters of Central Texas, Board Member (2000-2004)

Children's Advocacy Center of Central Texas, Advisory Board Member (1997-2004)

National Center for Women and Policing, Board Member (1998-2008)

Texas Institute for Public Problem Solving, Executive Board Member (1998-2004)

## PUBLICATIONS

Frasier, Margo L., The Use of Conducted Energy Devices (Tasers), *Telemasp Bulletin,* Texas Law Enforcement Management and Administrative Statistics Program, (2005) Vol. 12, No. 6, pp. 1-11.

Frasier, Margo L., Search and Seizure, *Suing and Defending Governmental Entities Seminar 2005,* Texas Bar CLE, Vol. 17, Chapter 12, pp. 1-8.

Frasier, Margo L., Use of Force Training, *Suing and Defending Governmental Entities Seminar 2010,* Texas Bar CLE, Vol. 22, Chapter 9, pp. 1-22.

Frasier, Margo L., Law Enforcement Update:   What the Courts and the Legislature Have Been Up to in 2010-2011, *Suing and Defending Governmental Entities Seminar 2011,* Texas Bar CLE, Vol. 23, Chapter 17, pp. 1-4.

Frasier, Margo L., Hot Topics in Jail Administration, *Advanced Government Law 2015,* Texas Bar CLE, Vol. 27

## CONFERENCE PRESENTATIONS

New County Judges and Commissioners School, LBJ School of Public Affairs, University of Texas at Austin, Austin, Texas, January 2005.  Presentation on Jail and Law Enforcement Liability

American Jail Association, Annual Conference, Kansas City, Kansas, May 2005.  Presentation   of paper entitled:   Legal Consequences of Prison Rape

17th Annual Suing and Defending Government Entities Seminar, San Antonio, Texas, July 2005 Presentation of paper entitled: Search and Seizure

Oregon Jail Managers' Association, Ontario, Oregon, August 2005. Two day presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

South Dakota Jail Administrators' Association, October 2005. Two day presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Oregon Sheriffs' Association, December 2005. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Women in Criminal Justice Seminar, Corrections Management Institute of Texas, Dallas, Texas, April

2006. Presentation on "Managing and Being Managed"

American Jail Association, Annual Conference, Salt Lake City, Utah, May, 2006. Presentation of paper entitled: Prison Rape Elimination Act, Investigating Sexual Assault Allegations in Jail Settings

Utah Sheriff's Association, Annual Conference, Salt Lake City, Utah, September 2006. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Virginia Sheriff's Association, Annual Conference, Virginia Beach, Virginia, April 2007. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Michigan Sheriff's Association, Annual Conference, Thompsonville, Michigan, June 2007. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

National Sheriffs' Association, Annual Conference, Salt Lake City, Utah, June 2007. Participation on panel of experts on the Prison Rape Elimination Act

Women in Criminal Justice Seminar, Corrections Management Institute of Texas, San Antonio, Texas, May 2008. Presentation on "Women as Leaders"

Texas Association of Counties' Leadership Reunion, Bandera, Texas, May 2008. Presentation on "Leading with Ethics"

22nd Annual Suing and Defending Government Entities Seminar, San Antonio, Texas, July 2010, Presentation of paper entitled: "Use of Force Training"

Texas Municipal League Attorneys' Workshop, Austin, Texas, September 2010, Presentation of paper entitled: "Use of Force Training"

Texas Association of Counties, 2010 Annual Seminar, September 2010, Presentation on jail overcrowding and possible solutions

23nd Annual Suing and Defending Government Entities Seminar, Austin, Texas, July 2011, Presentation of paper entitled: "Law Enforcement Update"

Legal Training for Travis County Constables, March 2012, Presentation entitled "Law Enforcement Perspective: Working with a Diverse Population"

25th Annual Corrections Accreditation Managers' Association, Austin, Texas, April 2012, Presentation entitled "Accountability"

National Sheriffs' Association, Annual Conference, Nashville, Tennessee, June 2012, Presentation entitled "Implementing the Prison Rape Elimination Standards"

National Association of Women Law Enforcement Executive, Annual Conference, Austin, Texas, August 2012, Presentation entitled "Executive Response to Critical Incidents"

Sheriffs' Association of Texas, New Sheriffs' Management School, Austin, Texas, December, 2012, Presentation entitled "Ten Things to Know as a New Sheriff"

27th Annual Advanced Government Law Seminar, Austin, Texas, July, 2015, Presentation of paper entitled: "Hot Topics in Jail Administration"

(revised 04/27/2016)

## CASES IN WHICH MARGO L. FRASIER HAS TESTIFIED
## IN PAST FOUR YEARS
### (revised July 29, 2016)

Annette Aguilera, Individually, and as Next Friend of Susie Aguilera, A Minor v. Maverick County, et al., Cause No. 06-09-21974-MCV, 293rd District Court of Maverick County, Texas (retained by defense counsel, Rodney Handel) (gave testimony at trial)

Justin Borum, et al. v. Swisher County, Civil Action No. 2:14-CV-00127, United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel Malerie Anderson) (gave testimony by deposition and at trial)

Leland Craig v. Sheriff Joe Pollock, et al., Cause No. A-07-CA-306-SS, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Bob Bass) (gave testimony at trial)

Zackary Kegan Cruz v. City of Brownfield Police Department Officer Joshua Coronado, et al., Civil Action No. 5:12-CV-00123-C, United States District Court, Northern District of Texas, Lubbock Division (retained by defense counsel, Matt Matzner) (gave testimony at trial)

Donna Davis, Individually and on behalf of the Estate of Richard Davis and minors Cody Davis, Katherine Davis and Megan Davis v. Montgomery County, et al., Civil Action No. 4:07-CV-00505, United States District Court, Southern District of Texas, Houston Division (retained by plaintiffs' counsel, Lanny Ray) (gave testimony by deposition)

Nichole DeShazo, Special Administrator of the Estate of Charles DeShazo, deceased v. Elvis Baneski, et al., Civil Action No. 14-CV-1575. United States District Court, Northern District of Illinois, Western Division (retained by defense counsel, Dominic Lanzito) (gave testimony by deposition)

Robert de la Garza v. Kirby Brumby, Individually and in His Official Capacity as Sheriff of Goliad County, Texas, , Civil Action No. 6:11-CV-00037, United States District Court, Southern District of Texas, Victoria Division (retained by defense counsel, Casey Cullen) (gave testimony by deposition)

Dumas Towing, LLC v. Sheriff J.E. (Bo) DeArmond and Scott Higginbotham, Civil Action No. 2:11-CV-121-J, in the United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel, Matt Matzner) (gave testimony by deposition)

Mario Del Refugio Escamilla, et al. v. Webb County, et al., Civil Action No. 5:11-CV-13, in the United States District Court, Southern District of Texas, Laredo Division (retained by defense counsel, Charles Frigerio) (gave testimony by deposition)

1

Maria Garcia, Individually and as Next Friend of Minor, J.G. v. Navasota Independent School District, et al., Civil Action No. 4:09-cv-03892, United States District Court, Southern District, Houston Division (retained by defense counsel, Todd Clark) (gave testimony by deposition)

Monica Garcia, Individually, et al. v. LCS Correction Services, Inc., et al., Civil Action No. 2:11-CV-00004, United States District Court, Southern District of Texas, Corpus Christi Division (retained by defense counsel, Myra Morris) (gave testimony by deposition and at trial)

Estate of Andres L. Gutierrez, Deceased, et al. v. Frio County Sheriff's Deputy Roger Salinas, Individually and Officiall, et al., Civil Action No. 5:10-CV-00735-OLG, United States District Court, Western District of Texas, San Antonio Division (retained by defense counsel, Eileen Leeds) (gave testimony at trial)

Florida Harris v. Polk County, et al., Civil Action No. 6:13-CV-00412, United States District Court, Eastern District of Texas, Tyler Division (retained by defense counsel, Eric Magee) (testified at trial)

Marie Hicks-Fields, et al. v. Christopher Pool, et al., Civil Action No. 4:12-CV-3650, United States District Court for the Southern District of Texas, Houston Division (retained by defense counsel, Lisa Hulsey) (gave testimony by deposition)

James Adison Holmes, Jr. v. John Doe Scouts, et al., Civil Action No. C-09-273, United States District Court, Southern District, Corpus Christi Division, (retained by defense counsel, Kevin Cullen) (gave testimony at trial)

Tylon Hudson, et al. v. Toni Preckwinkle, et al., Civil Action No. 13-CV-8752, United States District Court, Northern District of Illinois, Eastern Division (retained by defense counsel, Paul McGrady) (gave testimony by deposition and at trial)

Mosevelt Jackson, Jr. and Linda Jackson v. Washington County, et al.; Civil Action No. A-09-CA-878, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Eric Magee) (gave testimony at trial)

Elizabeth Lawson v. City of Jefferson, et al., Civil Action No. 2:13-CV-00105, United States District Court, Eastern District of Texas, Marshall Division (retained by defense counsel, Darren Coleman) (gave testimony by deposition and at trial)

Michelle Martinez, et al. v. Maverick County, et al., Civil Action No. DR-08-CA-077, United States District Court, Western District of Texas, Del Rio Division (retained by defense counsel, Norman Giles) (gave testimony by deposition)

Cindy Moreno, et al. v. The City of Brownsville, et al., Civil Action No. 1:08-CV-504, United States District Court, Southern District of Texas, Brownsville Division (retained by defense counsel, Eileen Leeds) (gave testimony by deposition)

2

<u>Jay Anthony Nottingham v. Joel Finsterwald, Sheriff of Wheeler County, Carrie Gaines, Wheeler County Jail Administrator, and Wheeler County, Texas</u>, Civil Action No. 2:10-CV-0023-J, United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel, Matt Matzner) (gave testimony at trial)

<u>Pascual O. Olibas and Cheryl Olibas, Individually and d/b/a Freedom Bail Bonds v. Ronny Dodson, Individually and in his Official Capacity as Sheriff of Brewster County and Brewster County</u>, Civil Action No. 4:11-CV-00094-RAJ, United States District Court, Western District of Texas, Pecos Division (retained by defense counsel, Greg Hudson) (gave testimony by deposition)

<u>Michelle Sheffield v. John Doe I, Individually and in his Official Capacity, Williamson County and the Williamson County Sheriff's Department</u>, Civil Action No. A-11-CA-300-LY, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Charles Frigerio) (testified at trial)

<u>Robert Shreve, et al. v. Franklin County, Ohio, et al.</u>, Cause No. 2:10-CV-244, United States District Court, Southern District of Ohio, Eastern Division (retained by intervenor's counsel, Aaron Fleisher, U. S. Department of Justice) (gave testimony by deposition)

<u>United States of America v. Terry S. Johnson, in his official capacity as Alamance County Sheriff</u>, Civil Action No. 1:12-CV-1349, United States District Court, Middle District of North Carolina (retained by plaintiff counsel Michael Songer, United States Department of Justice) (gave testimony by deposition and at trial)

<u>United States of America v. Maricopa County, Arizona, et al.</u>, Civil Action No. 2:12-CV-00981-LOA, United States District Court for the District of Arizona (retained by plaintiff counsel Jennifer Mondino, United States Department of Justice) (gave testimony by deposition)

3